# EXHIBIT F

### THE LABOR RELATIONS CONNECTION, INC.
### ARBITRATOR'S OPINION AND AWARD
Michael W. Stutz, Arbitrator

_____

In the Matter of Arbitration between

### MASSACHUSETTS NURSES ASSOCIATION

### -and-

### STEWARD HOLY FAMILY HOSPITAL
### (Methuen, MA)

*Maureen Bean Termination*
*LRC Case No. 302-16*

_____

### <u>AWARD of the ARBITRATOR</u>

The undersigned arbitrator, having been designated by the Parties through the offices of The Labor Relations Connection, Inc., pursuant to their collective bargaining agreement, and having duly heard the proofs, allegations and contentions of the Parties, AWARDS as follows:

1) The termination of Maureen Bean was not for just cause.

2) As remedy, the Employer shall convert the grievant's termination to the second step of progressive discipline, a written warning, reinstate her to her position, and make her whole for lost benefits under the Contract, including, *inter alia*, back pay and seniority, minus interim wages and/or unemployment benefits, if any, plus legal interest.

_____

June 8, 2017                                   Michael W. Stutz

## BACKGROUND

Hearings in this matter were held on November 18 and December 9, 2016, and February 17 and March 3, 2017, at the Employer's hospitals in Haverhill and Methuen, Massachusetts, before the undersigned, appointed arbitrator by the parties through the offices of The Labor Relations Connection, Inc.

McDonald Lamond Canzoneri, by James F. Lamond, Esq. and Allison J. Zimmon, Esq., represented the Union. Fisher & Phillips, LLP, by Joseph W. Ambash, Esq. and Joshua D. Nadreau, Esq., appeared on behalf of the Employer.

The hearing was stenographically transcribed by Kaczynski Reporting. Both parties submitted closing arguments by May 8, 2017.

## AGREED ISSUES

The parties stipulated the following questions to arbitration:

1) Was the termination of Maureen Bean for just cause?
2) If not, what shall be the remedy?

## STATEMENT OF THE CASE

Steward Holy Family Hospital (the "Hospital," "Employer," or "management") and the Massachusetts Nurses Association (the "Union") are parties to a collective bargaining agreement (the "Agreement") that requires just cause to terminate an employee and provides for arbitration of disputes.

The Steward Holy Family Hospital in Methuen, Massachusetts is a 250-bed, non-profit, Catholic hospital where nurses are represented by the Union. Hospital policies prohibit harassment, intimidation and violence, and require employees to treat each other with respect, patience and courtesy. The Hospital's discipline policy includes progressive, corrective discipline of warnings (verbal, written and final written) and no suspension before termination.

2

This case concerns the Hospital's decision to terminate a long-term, Registered Nurse ("RN"), Maureen Bean (the "grievant"), who, since 2002, worked in the St. Camillus medical-surgical unit, where she received good performance evaluations, trained new hires, and rotated as supervisor. She had a prior record of two counseling sessions and a recent verbal warning.

St. Camillus is a 32-bed medical-surgical unit with telemetry, where six or seven nurses are each assigned to five or six patients. There is a single hallway with a nursing station at the entrance, patient rooms off each side, a medicine room also off the hallway, and a break room at the very end. The medicine room has a computerized drug storage unit that dispenses, receives and accounts for patient medications. The break room has a time clock, lockers, a refrigerator, sink and bathroom.

The incident that resulted in the grievant's termination occurred on Tuesday, February 2, around 7:00 a.m. when the shift, including the grievant and Ms. Waterhouse, were clocking into work in the break room. The grievant reported the incident to Human Resources 10 days later, on Friday, February 12, and the Hospital launched an investigation by interviewing the participants.

Nancy Waterhouse testified that the grievant grabbed her face at the door to the break room, and, talking like a baby, asked if everything worked out with her vacation. She thought the encounter lasted about five seconds, and described it as follows.

> She grabbed me by the face one-handed, just like you would when you're scolding a child, and she basically got right into my face and kind of like was shaking her head and kind of laughing and saying, did you get your vacation all straightened out, and just puckering up her lips and making this face.
> Q. Did you say anything?
> A. I did. I was very, I was flabbergasted, and I said, I yelled at her actually, I said, "You know what, Maureen, why don't

3

you worry about your own vacation and let me worry about mine."

Later that same day, while Ms. Waterhouse was bent over the Pyxis computer in the Medicine room off the hallway, the grievant came up behind her, ran her finger along her back, and said, "I didn't mean to upset you back there. We need to do something about this vacation policy."

Ms. Waterhouse described her response to the grievant:

> I stood up and I looked at her and I said, "You know what, Maureen, you're right, we do need to do something about this vacation policy. But, calling me four or five times and harassing me at home and grabbing me by the face is not the way to handle it. That's not the right thing to do."

The grievant told Ms. Waterhouse the reason for her calls was to let her know about the up-coming Union meeting to discuss vacation issues on St. Camillus.

In her sworn testimony at arbitration, the grievant denied any physical contact with Ms. Waterhouse in either incident.

The grievant recalled walking into the break room, seeing Nancy, and asking if she got her message. Ms. Waterhouse responded that the grievant's phone calls were bordering on harassment. As the grievant left the room, Ms. Waterhouse pointed her finger at the grievant and said, "You worry about your vacation and I'll worry about mine." The grievant recalled that she did not reply, and left the room.

The grievant next encountered Ms. Waterhouse hours later in the medicine room, where Ms. Waterhouse was at the computer of the drug dispenser. The grievant stood behind her in the very small space and said she was sorry she felt harassed, that she did not intend to harass her, and that she wasn't calling about vacation when she called twice on Friday, but about the Union meeting. The grievant denied touching Ms. Waterhouse, or running her finger along her back.

4

The only corroborative evidence was the statement by Margot Messina that she saw the grievant squeeze Ms. Waterhouse's cheek, which she perceived as a friendly gesture between close colleagues. Ms. Messina no longer works for the Hospital and did not testify.

Ms. Waterhouse explained why she waited 10 days to complain to Human Resources:

> I don't rush into anything, I like to think long and hard about things that I'm going to do, particularly when it involves a co-worker and a situation such as this, but I thought about it, and, you know, all of the phone calls and the grabbing me by the face, I just decided, you know what, this behavior needs to stop, so I went to Human Resources.

Communication issues confused scheduling vacations in 2016. Four nurses applied for vacations during the first two weeks in March, including the grievant and Ms. Waterhouse, whose requests Ms. Ouellet approved, only to rescind her approval when more senior nurses requested the same vacation weeks.

In mid-January, Ms. Ouellet approved Nancy Waterhouse's request for the first two weeks of March to go skiing with family, and Ms. Waterhouse paid money towards a vacation-house rental. Then, Ms. Ouellet received and granted a request for these same two weeks from a more senior Nurse.

Ms. Waterhouse learned of this change in circumstances from the grievant's telephone call to her home. Ms. Waterhouse called Ms. Ouellet and told her that one of the requests for the first two weeks of March may be withdrawn. Ms. Ouellet asked Ms. Waterhouse to find out if that was true. Ms. Waterhouse confirmed the withdrawal, told Ms. Ouellet, and understood that her vacation was again approved.

The grievant initially requested the first week of March for a vacation to celebrate her anniversary. Ms. Ouellet offered her the second week of March, which the grievant accepted, and understood was approved.

5

The grievant learned that Ms. Waterhouse, who has less seniority than the grievant, believed she had the first two weeks of March for vacation when Ms. Waterhouse signed up for these weeks on a newly-instituted vacation calendar in the break room in late January.

Since Ms. Ouellet denied the grievant's request for vacation the first week of March, the grievant believed Ms. Waterhouse's request for the same week would be denied. Therefore, the grievant called Ms. Waterhouse at home to let her know there may be a problem with her vacation dates, knowing she had put money down on a house.

The grievant called Ms. Waterhouse and left messages to call back without giving a reason, "Nancy, this is Maureen. I'd appreciate it if you would give me a call." After leaving a second message, they spoke. The grievant described their conversation as follows;

> Okay, so I said to her, I said, Nancy, I noticed that you put your name up on the new calendar in the back, I said, but I really think you should talk to Chris about getting those two weeks off, I know you booked a vacation, because I was already denied the vacation the first week on March, and Arlene got it, so I felt bad.

Ms. Waterhouse told the grievant, "It is what it is." She said that she had already been granted her vacation by Ms. Ouellet.

On Friday, January 29, the grievant worked and Ms. Waterhouse was off. A colleague told the grievant that the Union was meeting Wednesday, February 3, to discuss vacation problems on the unit, and suggested she attend.

The grievant testified that she called Ms. Waterhouse on that Friday to convey the news about the Union meeting. Ms. Waterhouse did not answer, nor return the call, believing it concerned the vacation issue, which she understood from Ms. Ouellet was clarified.

The grievant testified that she did not call Ms. Waterhouse again after leaving messages on Friday. Ms. Waterhouse testified that the grievant called and left messages on both Saturday and Sunday, without explaining the subject of the call.

The Hospital's Human Resources investigated Ms. Waterhouse's allegations, and concluded she violated Hospital policy and terminated her for grabbing Ms. Waterhouse by the face. At arbitration, the Hospital added as reasons for the termination the grievant's allegedly harassing telephone calls to Ms. Waterhouse's home, the medicine room interaction, and the grievant's prior counselings and warning, as reasons for the termination.

The primary witnesses at arbitration were Nancy Waterhouse, the complaining witness, Chris Ouellet, Supervisor of St. Camillus, and the grievant. Also testifying for the Hospital was Patricia Gauron, Director of Human Resources, and Elizandra Adams, RN. The Union presented testimony from Gayle Burke, Union Committee Co-Chair and RN.

Chris Ouellet, Nurse Manager on St. Camillus, has worked for the Hospital a total of 26 years, 12 years as Nurse Manager, and five and one-half years overseeing St. Camillus. Ms. Ouellet described meetings with the grievant four years earlier after the grievant angrily pulled the ponytail of a colleague, and late in 2015 after Elizandra Adams complained that the grievant demeaned a student nurse and offended Ms. Adams. After both incidents, Ms. Ouellet met with the grievant and the complaining coworker to discuss the problem and clear the air. Ms. Ouellet considered these meetings counseling sessions. She also gave the grievant a verbal warning a week before the face-grabbing incident with Ms. Waterhouse for profanely defying her directive.

Vacations requests are submitted to Ms. Ouellet, who grants them based on seniority. Confusion over the procedures on St. Camillus resulted in a Union meeting being scheduled for Wednesday, February 3, 2016.

During the Hospital's investigation, Ms. Gauron asked the grievant how her colleagues would describe her, and she said, as a "bitch," because she holds them accountable. When Ms. Gauron told the grievant there was a witness who saw her take Ms. Waterhouse's face in her hand, the grievant said the witness was lying.

Monica Messina was with the grievant and witnessed the incident. She no longer works for the Hospital and did not testify, but was interviewed on February 16, 2016 by telephone by Carolann Olsen from Human Resources, who prepared a written summary that was introduced into evidence over the Union's hearsay objection with the arbitrator's assurance that it was not taken for the truth.

According to this hearsay documentation of the interview, Ms. Messina saw the grievant squeeze Ms. Waterhouse's cheek and ask if she got her message. Ms. Messina described the cheek squeeze as a "friendly gesture," but also described the grievant as difficult to work with and "somewhat of a bully."

Elizandra Adams testified at length about unhappy interactions with the grievant when she started on St. Camillus in July, 2015. Ms. Adams complained to Ms. Ouellet and met with the grievant and Ms. Ouellet in October 2015 to clear the air in what Ms. Ouellet considered a counseling session for the grievant.

## POSITIONS OF THE PARTIES

**Hospital:**

The Employer argues that it had just cause to terminate the grievant for the "assault" of a colleague during a dispute about vacation, only a week after the grievant was warned for an obscenity-laden outburst against her manager and an insubordinate refusal of a supervisory directive.

The Hospital points out that the grievant has never admitted she touched Ms. Waterhouse, much less apologized or taken responsibility for her actions.

8

The Hospital notes that its investigation of Ms. Waterhouse's allegations concluded that the grievant violated polices, including the Code of Conduct and the Zero Tolerance of Disrespect policy, and terminated her for just cause.

The Hospital points to the testimony of Elizandra Adams that the grievant treated her disparagingly and turned up a saline device attached to a patient, and cites Ms. Ouellet's counselings and warning.

The Hospital argues the just cause provision is limited by language that prohibits the arbitrator from substituting his judgment for that of the Hospital, and the arbitrator is not tasked with determining whether he would reach the same conclusion as the Hospital.

The Hospital argues the seven tests of just cause: there was notice in the policies; the requirement of civil conduct is reasonable; the Hospital's investigation was fair and objective; and proved the grievant violated policies when she grabbed Ms. Waterhouse by the face. The Hospital says the penalty of termination was equal to discipline of other employees, pointing to four prior terminations, including for assaulting a patient, putting a colleague in a headlock, and for "physical interaction."

The Hospital attacks the credibility of the grievant and asserts that she is the only liar in the case.

It is the Hospital's position that termination was appropriate for the grievant's conduct, standing alone, without prior, progressive discipline, because it amounted to a physical assault on a coworker. Nonetheless, the Hospital points to the verbal warning issued to the grievant the week prior to the incident at issue, and suggests that, since the warning did not prevent the grievant's misconduct towards Ms. Waterhouse, further progressive discipline was unlikely to correct the grievant's conduct.

> Ms. Bean had a history of intimidating behavior, had been
> counselled at least twice, and was issued a verbal warning a

mere eight days prior to her assault of Ms. Bean. The fact
that a verbal warning did nothing to quell Ms. Bean's hostile
behavior further supports the Hospital's conclusion that
termination was the only reasonable course of action.
Attacking a colleague is the very definition of the type of
*malum in se* act that is so obviously unacceptable that the
employer-employee relationship cannot be repaired.

For these and other reasons, the Hospital asks the arbitrator to deny the
Union's grievance and to sustain the termination.

**Union:**

The Union says the grievant was not guilty of misconduct, and there
was no cause for discipline. In the alternative, if there was cause for
discipline, termination was an excessive penalty.

The Union closely analyzes the evidence in the record, to argue the
Hospital did not abide by its due process promises in the Agreement,
the investigation was not objective, and the Employer relied on past
events that were not subject to discipline to magnify the penalty.

The Union argues that Ms. Waterhouse blamed the grievant for her
denial of vacation request because the grievant was more senior and
was granted one of the two weeks' vacation that Ms. Waterhouse lost.

It appears to be an inescapable inference that Waterhouse
viewed Bean as responsible for the loss of the vacation, yet
that did not seem to register with the HR investigators who
were weighing who to believe.

The Union says the Hospital failed to prove impermissible contact
between the grievant and Ms. Waterhouse. The Union notes that Ms.
Messina's hearsay account portrayed the grievant's action as a friendly
gesture, and that there was nothing for the grievant to be angry about.

The Union argues there was nothing wrong with, or harassing about,
the grievant's telephone messages to Ms. Waterhouse, nor should they

even be considered by the arbitrator because Ms. Ouellet did nothing after she received Ms. Waterhouse's initial complaint about the calls.

The Union asks the arbitrator to conclude that it was unlikely that the grievant would grab Ms. Waterhouse by the face since she had no difficulty with Ms. Waterhouse, although Ms. Waterhouse may have harbored resentment towards the grievant.

The Union asks the arbitrator to draw an adverse inverse from the Hospital's failure to present testimony from Ms. Kirby, with whom Ms. Waterhouse discussed the incident the morning it happened. The Union says the absence of this testimony means Ms. Kirby would not describe a hostile or angry or unpleasant encounter between the grievant and Ms. Waterhouse.

The Union acknowledges that Ms. Messina's hearsay statement that the grievant squeezed Ms. Waterhouse's cheek, but notes that Ms. Messina perceived it as a friendly gesture.

The Union asserts that the Employer has condoned the grievant's conduct for many years with good performance reviews.

The Union contends that the grievant was denied the benefit of progressive discipline and, as remedy, the discharge rescinded, the grievant reinstated with seniority, benefits and back pay, plus 12% quarterly compounded interest, and any other remedy the arbitrator may deem just and proper.

## **OPINION**

Resolution of the just cause issue presented by this case requires review of the evidence, to decide: 1) whether the grievant was guilty as charged, and, 2) if so, whether the penalty of termination was appropriate under all the circumstances. The Hospital has the burden of proving the grievant's guilt and that the penalty was appropriate.

As a threshold matter, I have to determine exactly what the grievant was charged with because the Hospital did not issue the normal a termination notice with charges that employees have the right to under the just cause provision of the Agreement in order to prepare a proper defense.

When the Union asked the Hospital to provide reasons, the Hospital identified "grabbing" a colleague's face as the reason, which, in final argument, the Hospital referred to as an "assault." Therefore, I will decide whether the Hospital proved that the grievant was guilty of misconduct by grabbing a colleague's face.

Facts

The essential charge is disputed because Ms. Waterhouse described the grievant taking her face in one hand, squeezing her cheeks, and asking about her vacation using baby talk, while the grievant denied any physical contact with Ms. Waterhouse whatsoever. In order to decide what happened, I have to make a credibility determination between these diametrically opposed accounts.

The context for the incident was a dispute over competing vacation requests for two weeks in March, amid allegations of communication problems over vacation scheduling in St. Camillus that resulted in scheduling a Union meeting. Both the grievant and Ms. Waterhouse requested vacation the same week, both requests were approved by Ms. Ouellet, and both approvals were rescinded when more senior nurses requested the same weeks. The Union meeting was scheduled for the day after the incident.

12

Sometime between Thursday, January 28 and Sunday, January 31, the grievant called Ms. Waterhouse at home about five times. They only spoke once, discussing the vacation situation without rancor. The grievant subsequently called Ms. Waterhouse three times and left messages asking for a return call that Ms. Waterhouse did not return.

When the grievant and Ms. Waterhouse saw each other Tuesday, February 2, while clocking into work, the grievant asked Ms. Waterhouse whether she got her messages. Ms. Waterhouse says the grievant took her face in one hand while asking in baby talk about her vacation, "Did you get your vacation straightened out?" or something to that effect. Ms. Waterhouse told the grievant to worry about her own vacation and she'd worry about hers.

Subsequently, the two women had an encounter in the tiny medicine room when Ms. Waterhouse says the grievant ran her finger along her back and said she didn't mean to upset her. The grievant confirmed the encounter, but denies that she touched Ms. Waterhouse.

Analysis

Considering all the evidence, I was persuaded that Ms. Waterhouse testified truthfully that the grievant held her face; I found the grievant's denials unbelievable and untruthful.

I make this determination considering all of the evidence, but especially weighing the hearsay, corroborating statement by Ms. Messina that the grievant squeezed Ms. Waterhouse's cheek in what Ms. Messina perceived as a friendly gesture.[1]

Even in a nursing context, where physical contact is a constant part of the job, the grievant's action was an inappropriate, unconsented touching that was motivated, in part, by the grievant's frustration that Ms. Waterhouse hadn't returned her three telephone messages, and by

---

[1] The hearsay statement corroborated Ms. Waterhouse's allegation that the grievant squeezed her cheek because Ms. Messina closely witnessed the incident, was not shown to have motive to fabricate, and was interviewed in the presence of the Union. The statement contradicts any suggestion that the grievant intended to harm Ms. Waterhouse, or that Ms. Waterhouse was placed in fear of harm.

13

the competition between the two nurses over vacation. Ms. Waterhouse felt bullied and harassed by the grievant's repeated telephone calls to her at home over the weekend about a resolved vacation issue, or so she thought. The grievant says the unreturned calls concerned the Union meeting, which may be, at least partially, true. Ms. Waterhouse's feisty response to the grievant suggests she held her own in the interaction.

It is most significant to consider that the grievant was previously counseled by Ms. Ouellet for angrily pulling a colleague's ponytail because holding Ms. Waterhouse's face was similar, unconsented, physical touching motivated by negative emotions. Therefore, the grievant was guilty of misconduct for which there was just cause to impose discipline.

The crux of this case revolves around whether the grievant's misconduct was so serious that it justified termination in the first instance. Essentially, the Hospital argues that the conduct amounted to a violent assault by the grievant on Ms. Waterhouse that justified termination.

"Assault" has different meanings in criminal and civil law. Civilly, an assault is the intentional tort of putting someone in fear of harm, and a battery is an intentional, unconsented touching. In criminal law, assault means an intent to harm someone by striking them or threatening harm. Thus, to prove an assault, the Hospital must prove intent to harm and that the victim feared harm.

The interaction between the grievant and Ms. Waterhouse was not an assault. There was no evidence that the grievant intended harm or that Ms. Waterhouse was placed in fear. Rather, out of frustration or irritation, the grievant briefly held her long-time colleague by the cheeks with one hand for a few seconds, while asking about her messages and whether her vacation worked out. Ms. Waterhouse understandably felt mildly bullied and upset by the interaction, but the grievant didn't intend to, nor did she, hurt her.

14

Since the charges were limited to the allegation that the grievant grabbed Ms. Waterhouse's face, there was no basis to discipline her for the calls to Ms. Waterhouse or the interaction in the medicine room. There is no rule against calling a colleague and there was no misconduct in the medicine room interaction.

Only the most serious misconduct, so-called "capital" offenses in the workplace, justifies termination without resort to progressive discipline. These capital offenses include violence, theft, dishonesty and gross insubordination.

The grievant's conduct was an unconsented touching, a civil battery, but not a violent act that justifies termination in the first instance, without progressive discipline. The grievant's act was not violent, was not an assault, and was not so serious that it justified termination in the first instance. Rather, it was misconduct properly addressed by the Hospital's policy of progressive discipline.

The grievant was at the verbal warning level of discipline in a system of progressive discipline that includes a written warning and final written warning before termination. Therefore, she was not subject to termination for the misconduct in this case, but should receive the next level of discipline, a written warning, to persuade her to correct unacceptable conduct. In theory, this second step of progressive discipline should awaken the grievant to the need to correct her conduct or face further discipline, including termination.

Prior counseling, the recent warning, and this incident reveal unacceptable interactions between the grievant and her colleagues and supervisor that the Hospital may reasonably require the grievant to correct with progressive discipline.

For these reasons, the Hospital's termination of the grievant was not for just cause, but there was just cause for a written warning, the second step of progressive discipline under the Hospital's policy.

<u>Remedy</u>

The purpose of remedy is to return the injured party, in this case the grievant, to the same economic position she would have enjoyed but for the violation of the Contract.

As remedy, I will direct the Hospital to reduce the discipline to a written warning, reinstate the grievant to her position, and make her whole for lost benefits under the Contract, including, *inter alia*, back pay and seniority, minus interim earnings and unemployment benefits, plus legal interest.

June 8, 2017                                   Michael W. Stutz

16